UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS LOCAL 2230,

                 Petitioner,

        -against-


BROOKHAVEN SCIENCE ASSOCIATES, LLC,

                 Respondent.
-------------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**
21-CV-02952 (GRB) (JMW)

**WICKS,** Magistrate Judge:

Among the many effects of COVID-19 is the flurry of countless lawsuits that ensued in many contexts.[1] Courts and litigants alike continue to grapple with the issue of applying agreed-upon contractual terms to the unprecedented—and indeed unforeseen—calamity that we as a nation continue to struggle with. The parties to the instant suit are no different.

Petitioner International Brotherhood of Electrical Workers Local 2230, a labor union, and Respondent Brookhaven Science Associates, LLC ("BSA"), a science laboratory, are parties to a Collective Bargaining Agreement (the "CBA"). Petitioner commenced this action, pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 *et seq.*, and Section 9 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 9 *et seq.*, seeking to confirm an Arbitrator's award which directed Respondent to, pursuant to the CBA, pay certain graphic arts employees additional wages for time spent working from home following a COVID-19 emergency work period and to bargain with Petitioner over issues related to remote work directives. Respondent, in response, filed a cross-petition seeking vacatur of the arbitration award alleging that the Arbitrator exceeded his authority by manifestly disregarding the

---

[1] *See, e.g., Chrysafis v. James*, 21-cv-998 (JS) (ARL), 2021 WL 1405884 (E.D.N.Y. Apr. 14, 2021) (mortgage foreclosure); *DeMoura v. Cont'l Cas. Co.*, 20-CV-2912 (NGG) (SIL), 2021 WL 848840 (E.D.N.Y. Mar. 5, 2021) (insurance coverage); *N.Y. by James v. Amazon.com, Inc.*, 21-cv-1417 (JSR), 2021 WL 3140051 (S.D.N.Y. July 26, 2021) (state labor law).

terms of the CBA and applicable law. Before the Court on referral from the Honorable Gary R. Brown are the parties' cross-petitions. For the reasons that follow, the undersigned respectfully recommends that Petitioner's motion to confirm the arbitration award be granted, and that Respondent's motion to vacate the arbitration award be denied.

## I.    BACKGROUND[2]

Respondent is multidisciplinary laboratory located on Long Island, New York. According to its website, Respondent employs well over two thousand staff members.[3] In addition to research team staff, Respondent employs graphic artists to work within its creative resources department. (DE 14-5 at 1.) Petitioner, also based on Long Island, is a labor organization formed pursuant to Section 501 of the LMRA. (DE 1 at 1.) Petitioner is the certified bargaining representative of certain employees of Respondent, including the laboratory's graphic arts workers. (*See id.*)

Petitioner and Respondent are parties to the CBA, effective from August 1, 2018 through July 31, 2023. (DE 1 at 2.) The CBA contains a handful of provisions relevant to the present dispute. The starting point is Respondent's general authority to run the lab. The CBA provides the following:

**1.02 Laboratory Recognition:**

The right to manage the Laboratory and to direct the working forces and operations of the Laboratory subject to the express limitations of this Agreement, is exclusively vested in, and retained by, the Laboratory.

(DE 14-1 at 10.) Periods of emergency are governed by Section 4.13 of the CBA, which states:

**4.13 Period of Emergency Operational Status:**

When the Laboratory declares a period of emergency, employees excused from performing or completing their regular work schedules will suffer no deduction in base pay for those hours worked that fall within their regular schedule and within the emergency period.

Employees required to work during the emergency period will receive, in addition to regular pay, straight-time pay for all hours worked during the emergency period. Employees who report during the emergency period and not required to work receive no additional pay.

---

[2] As there is no dispute as to the underlying facts of this matter, the Court draws from each of the parties' submissions and exhibits for the relevant background.
[3] About Brookhaven, *Brookhaven Nat'l Lab.*, https://www.bnl.gov/about/ (last visited Sept. 17, 2021).

> However, when the Laboratory excuses the lateness of certain employees or permits certain employees to leave before the end of their scheduled work period without loss of pay, but does not declare a period of emergency, employees working during the excused periods shall not be entitled to emergency pay, but shall be paid at the rate of one and one-half (1½) times the employee's regular base rate . . . .

(*Id.* at 24.)  And, in its provision related to the safety of employees, the CBA states, in pertinent part:

> **13.01 Provision for Safety of Employees:**
>
> . . . b. Commitment to Safety: It is recognized that safety is everyone's responsibility and that working safely is a condition of employment. The Laboratory has the exclusive responsibility to provide a safe and healthful workplace and conditions of employment. The Laboratory shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment. It is also recognized that each Laboratory employee is responsible for working safely and for their own safety. Protective devices, wearing apparel and other equipment necessary for the protection from injury of employees in any department shall be provided by the Laboratory. The Union agrees to attend required training and to use provided protective devices, wearing apparel and other equipment (e.g., safety glasses, hard hats, safety shoes, seat belts and respirators) necessary for the protection of employees, unless such use will provide a greater hazard.

(*Id.* at 56.)

In March 2020, in response to the proliferation of the COVID-19 pandemic, Respondent directed all of its employees to work from home by declaring a "Period of Emergency Operational Status" (the "Emergency Period") pursuant to Section 4.13 of the CBA.  (DE 13 at 5; DE 16 at 6.)  Among such employees were the individuals located in Respondent's graphic arts department who, ordinarily, worked on-site and never from home.  (DE 13 at 5.)  Consequently, Respondent paid most graphic arts employees regular base pay for the Emergency Period despite not performing any work.  (*Id.*)  Because certain graphic arts employees did, however, receive assignments during the Emergency Period, Respondent agreed to pay these employees "straight time," in addition to normal pay, pursuant to the CBA's Emergency Period provision for work performed during such a period.  (*Id.*)

In May 2020, Respondent ended the Emergency Period and implemented a temporary work week schedule.  (*Id.* at 6.)  Without bargaining with Petitioner, Respondent directed certain graphic arts employees to continue working from home and directed others to resume in-person work.  (DE 1 at 2.)  Respondent began paying every graphic arts employee, irrespective of their work assignment, their regular pay rate.  (DE 13 at 6.)  In response, Petitioner filed a charge with the National Labor Relations Board

3

("NLRB") on June 23, 2020, alleging that Respondent violated the CBA by failing to bargain in good faith before "instituting a new staffing schedule and rotation in the graphic design group . . . after [Respondent] had resumed operations and after Long Island began ending quarantine." (DE 14-3 at 2 (capitalization altered).) On August 21, 2020, the NLRB deferred, as required by the CBA, the issues raised in Petitioner's charge to arbitration. (DE 14-4.)

On October 2, 2020, Petitioner filed its grievance, describing it in the following manner:

> The Laboratory failed to bargain with the Union before unilaterally instituting a new staffing schedule and rotation in the Graphic Design group within the Creative Resources department. This unilateral schedule change occurred after the Employer had resumed operations and after Long Island began ending the quarantine. The unilateral schedule change has violated Section 4.13 of the CBA in that employees who have worked during the excused period were not paid at the rate of one and one-half (1 ½) times their regular base rate.

(DE 14-5 at 1.) Petitioner demanded that Respondent pay all graphic arts employees working from home time and a half for all hours worked. (*Id.*) Respondent denied the grievance, prompting Petitioner to demand arbitration. (DE 1 at 3.) The parties selected Peter Gillespie as the Arbitrator, who held a hearing on March 5, 2021. (*Id.*)

The Arbitrator issued his decision and award on May 4, 2021. (DE 14-2.) At the outset, the Arbitrator stated the precise issues presented:

> Whether the subject of work from home assignment and their impacts, are mandatory subjects of bargaining and whether, in any event, the management rights provision(s) of the [CBA] reserves to management the right to make such assignments?

(DE 14-2 at 5.) Following his review of the CBA, the Arbitrator made three determinations relevant to the present dispute. *First*, the Arbitrator concluded that Section 4.13 of the CBA compelled Respondents to pay graphic arts employees working from home following the Emergency Period at a rate of one and a half times regular base pay. (*Id.* at 16.) Reading Section 4.13 as a whole, the Arbitrator reasoned that—because the parties had interpreted the initial two paragraphs as applying to work-at-home assignments for graphic arts employees—it was "inescapable" that the latter paragraph mandated the same interpretation, inferring that the term "excused" encompasses remote work. (*Id.*) *Second*, the Arbitrator determined that the otherwise sweeping language of Section 1.02—which empowers Respondent to direct its employees and

4

operations of the lab—was limited by Section 4.13, which, according to the Arbitrator, curtails Respondent's ability to dictate the graphic arts employees' pay in the circumstances presented. (*Id.* at 17.) And *third*, in interpreting the employee safety provisions, the Arbitrator found that Section 13.01(b) does not permit Respondent to unilaterally dictate employee work location, particularly in light of the provision's repeated references to safety equipment. (*Id.*) Based upon the foregoing, the Arbitrator concluded that Petitioner's grievance had merit and directed Respondent to (1) pay every graphic arts employee the balance of one and a half times their normal rate for time spent working from home after the Emergency Period; and (2) bargain in good faith, upon request from either party, the issue of directing work-from-home assignments. (*Id.* at 19.) Respondent had not complied with the arbitration award as of the commencement of this lawsuit. (DE 1.)

Petitioner now seeks to confirm the arbitration award and Respondent, on the other hand, requests vacatur. (DE 1, 12.) Needless to say, the parties oppose each other's respective petitions. (DE 12, 16.) On July 7, 2021, District Judge Gary R. Brown referred those petitions to the undersigned for a Report and Recommendation. (Electronic Order dated July 7, 2021.)

## II.  <u>LEGAL STANDARD</u>

The FAA provides, in relevant part:

> [A]t any time within one year after [an arbitration] award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title . . . .

9 U.S.C. § 9. This provision reflects the fact that "Congress enacted the FAA to replace judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts.'" *Hall St. Assocs., L.L.C. v. Mattel Inc.*, 552 U.S. 576, 581 (2008) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); *see also AmeriCredit Fin. Servs., Inc. v. Oxford Mgmt. Servs.*, 627 F. Supp. 2d 85, 91 (E.D.N.Y. 2008) ("The FAA represents a strong federal policy favoring arbitration agreements."). Accordingly, "confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court."

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (internal quotation marks and citation omitted).  Courts therefore accord an arbitration panel's decision "great deference" in considering whether to confirm or vacate an arbitration award.  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 103 (2d Cir. 2013) (citation omitted).  "Consequently, the burden of proof necessary to avoid confirmation of an arbitration award is very high, and a district court will enforce the award as long as 'there is a barely colorable justification for the outcome reached.'"  *Id.* at 103–04 (quoting *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008)).

Notably, deference to an arbitrator's interpretation of contracts is "especially strong."  *T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*, No. 13-CV-5356 (JMF), 2015 WL 394075, at *3 (S.D.N.Y. Jan. 29, 2015).  Thus, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue does not suffice to overturn his decision."  *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009) (internal quotation marks omitted); *see also Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 452 (2d Cir. 2011) ("[I]nterpretation of the contract terms is within the province of the arbitrator and will not be overruled simply because we disagree with that interpretation. If the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract the award must stand.") (internal quotation marks and citations omitted).

Although not unattainable, courts have made clear that "[v]acatur of arbitral awards is extremely rare, and justifiably so."  *Salus Cap. Partners, LLC v. Moser*, 289 F. Supp. 3d 468, 476 (S.D.N.Y. 2018) (citing *Hamerslough v. Hipple*, No. 10 Civ. 3056 (NRB), 2012 WL 5290318, at *3 (S.D.N.Y. Oct. 25, 2012)); *see Gottdiener*, 462 F.3d at 110 ("A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high.") (citing *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997)).  The FAA sets forth four grounds upon which a federal court may vacate an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient

cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party were prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)–(4).  The Second Circuit has recognized that, in addition to the statutorily delineated circumstances warranting vacatur, a court may also set aside an arbitration award rendered in "manifest disregard of the law," *Porzig v. Dresdner, Kleinwort, Benson, N.A. LLC*, 497 F.3d 133, 139 (2d Cir. 2007) or "where the arbitrator's award is in manifest disregard for the terms of the parties' relevant agreement," *Schwartz*, 665 F.3d at 452 (2d Cir. 2011).  A manifest disregard of the law exists only if "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it all together[;] and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 90 (2d Cir. 2005).  As alluded to above, a manifest disregard for the terms of the parties' relevant agreement does not exist simply because the court disagrees with the arbitrator's interpretation of the contract; rather, less than a barely colorable justification for his or her interpretation of the agreement must exist to warrant vacatur. *Schwartz*, 665 F.3d at 452.

### III.  DISCUSSION

**A. Motion to Vacate the Arbitration Award**

Respondent moves to vacate the Arbitration Award under Section 10(a) of the FAA on three grounds, namely that the Arbitrator (1) exceeded his authority in determining that Section 4.13 of the CBA requires employees to be paid time and a half for remote hours outside of emergency periods; (2) disregarded the plain meaning of the CBA in concluding that it does not confer the authority to Respondent to implement safety provisions relating to remote work assignments; and (3) manifestly disregarded the law regarding the contract coverage standard.  The Court finds each argument unavailing and discusses each in turn.

**1.   The Arbitrator Did Not Manifestly Disregard Section 4.13 of the CBA**

Respondent first contends that the Arbitrator's conclusions were in manifest disregard of the plain language of the CBA in finding that Section 4.13 requires Respondent to pay employees time and a half if working from home after the Emergency Period.  (DE 13 at 12.)  Petitioner counters that, because the Arbitrator explained the reasoning behind his interpretation of Section 4.13, the award cannot be vacated simply because Respondent espouses a different interpretation.  (DE 16 at 11.)

The Arbitrator did not manifestly disregard the plain language of the CBA in his determination that Section 4.13 requires that employees be paid time and half while working from home following the Emergency Period.  In his reasoning, the Arbitrator noted that the third paragraph of Section 4.13 — which, as interpreted, contemplates circumstances where employees are excused from work at the site but are nonetheless required to perform work assignments — "tracks the language governing pay for work during the emergency period set out in the first two paragraphs of [Section] 4.13." (DE 14-2 at 16.)  Relying on the undisputed fact that the parties agreed that the first paragraphs of Section 4.13 apply to remote-work assignments, the Arbitrator found it "inescapable" that the same interpretation should be applied to the final paragraph, thereby leading to the conclusion that the provision requires employees working remotely following the conclusion of the Emergency Period to be paid one and a half times base pay.  (*Id.*)  This analysis satisfies the Arbitrator's low burden of "provid[ing] even a barely colorable justification for his . . . interpretation of the" CBA, and therefore must stand.  *Schwartz*, 665 F.3d at 452.  Indeed, the plain meaning of Section 4.13, at minimum, suggests that Respondent has a duty, outside of an emergency period, to pay employees a higher rate who are "excused" from working their scheduled work period on site.  (DE 14-1 at 24.)

Respondent's contentions to the contrary do not move the proverbial needle.  Quarreling with the Arbitrator's interpretation of Section 4.13, Respondent argues that the "during the excused periods" language refers to situations where Respondent affirmatively excuses lateness or allows employees to leave early rather than when employees are simply directed to work from home.  (DE 13 at 12.)  Respondent's interpretation, however, disregards the earlier language in the provision, which speaks to employees being

"excused" from performing their regular work schedules, language that the parties have agreed includes working from home, albeit during an emergency period.  (DE 14-1 at 24; *see also* DE 13 at 6 ("There is no dispute over the actions of [Respondent] during the 'period of Emergency Operational Status.'").)  The Arbitrator relied on this language—and the parties' prior explication of it—in interpreting Section 4.13, leading to the plausible conclusion that employees are entitled to higher pay when working from home following the Emergency Period.  Respondent's mere disaccord with the Arbitrator's interpretation of Section 4.13 does not compel vacatur of the award.  *See InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 530–31 (S.D.N.Y. 2005).

Moreover, Respondent's reliance on *Leed Architectural Prod., Inc. v. United Steelworkers of Am., Loc. 6674*, 916 F.2d 63 (2d Cir. 1990) and *Int'l Brotherhood. of Elec. Workers, Loc. 175 v. Thomas & Betts Corp.*, 182 F.3d 469 (6th Cir. 1999) offers little help.  Both are inapposite, as each features an arbitrator inserting into collective bargaining agreements terms that simply did not exist.  In *Leed*, the Second Circuit held that the arbitrator exceeded his authority in reforming the terms of the collective bargaining agreement at issue by increasing the bargained-for employee wages explicitly set forth in the agreement.  916 F.2d at 66.  Similarly, in *Thomas*, an opinion from the Sixth Circuit, the court held that the arbitrator exceeded his authority by writing-in qualifying reasonableness language to a collective bargaining agreement term that explicitly provided for unqualified automatic termination of certain employees. 182 F.3d at 472.  The present case is readily distinguishable from *Leed* and *Thomas*.  The Arbitrator here did not inject terms into the CBA—the "time and a half" payment term is explicitly referenced in Section 4.13 of the agreement.  Said differently, the Arbitrator did not, as in *Leed* and *Thomas*, read a non-existent term into the CBA.  Rather, the Arbitrator merely *interpreted* the CBA as written and, as such, this Court may not disturb his findings.

Accordingly, the undersigned respectfully recommends that Respondent's motion to vacate regarding the Arbitrator's interpretation of Section 4.13 of the CBA be denied.

### 2.   The Arbitrator Did Not Manifestly Disregard Sections 1.02 and 13.01 of the CBA

Respondent next challenges the Arbitrator's interpretation of Sections 1.02 and 13.01 of the

CBA.  Specifically, Respondent claims that the Arbitrator disregarded Section 1.02 by concluding that Section 4.13's pay provisions limit Respondent's ability to direct its employees and manage the lab under Section 1.02.  (DE 13 at 14.)  Respondent then contends that the Arbitrator's interpretation that Section 13.01 only addresses safety equipment and training is too narrow and must therefore be vacated.  (*Id.*)

The Arbitrator provided a colorable and plausible justification for his interpretation of Sections 1.02 and 13.01 and, therefore, vacatur is inappropriate on those grounds.  Regarding Section 1.02, the Arbitrator considered that that section—which generally confers upon Respondent the exclusive authority to manage the lab and direct the employees and operations therewith—is restricted by the express limitations provided in the CBA.  (DE 14-2 at 17.)  The Arbitrator went on to conclude that Section 4.13 addresses the issue of pay as applied to the circumstances giving rise to this matter and, as such, operates as a limitation to Respondent's ability to manage and direct its employees.  (*Id.*)  This is a reasonable interpretation of the CBA, and therefore does not constitute a manifest disregard of its terms.  Regarding Section 13.01, the Arbitrator concluded that, given its reference to safety equipment and training, the provision does not apply to changes in work location.  (*Id.*)  Although Respondent espouses a far broader interpretation of the section—contending that it unambiguously grants exclusive authority to Respondent to make reasonable provisions for employee safety, including the authority to order remote work—the Arbitrator's interpretation is reasonable, particularly in light of the provision's reference to training and "safety glasses, hard hats, safety shoes, seat belts[,] and respirators."  That is, the Arbitrator did not manifestly disregard Section 13.01 in his decision.

The undersigned therefore respectfully recommends that Respondent's motion to vacate regarding the Arbitrator's interpretation of Sections 1.02 and 13.01 of the CBA be denied.

### 3.  The Arbitrator Did Not Manifestly Disregard the Law Regarding the Contract Coverage Standard

Finally, Respondent urges that the Arbitrator, in his interpretation of Section 13.01, manifestly disregarded the "contract coverage" standard as set forth in the NLRB administrative decision *MV Transportation Inc.*, 368 N.L.R.B. 66 (2019).  (DE 13 at 15.)  Petitioner asserts that, because Respondent

did not raise the contract coverage standard at arbitration, the Arbitrator did not err by not applying the standard in his decision.  (DE 16 at 15–16.)

The Second Circuit has made clear that to succeed in challenging an arbitration award for manifest disregard of the law the challenging party has the burden of demonstrating that the arbitrator actually knew about the relevant rule of law that he or she purportedly disregarded.  *See Gottdiener*, 462 F.3d at 111.  As such, a district court reviewing an arbitration award may "impute only knowledge of governing law identified by parties to the arbitration."  *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003) (citation omitted).  Respondent has not met its burden in establishing that the Arbitrator was aware of the contract coverage standard.  It is unsurprising, as Respondent asserts, that "the Arbitrator gave no consideration to this standard set out in *MV Transportation* . . . whatsoever," given that Respondent did not once raise this standard at arbitration.  (DE 13 at 15.)  Indeed, the record is devoid of any indication that Respondent brought *MV Transportation Inc.* and the contract coverage standard to the arbitrator's attention.  Moreover, Respondent's motion papers do not at all suggest Respondent raised this point of law at any point prior to the present dispute.  (*See id.* at 14–15.)  The Court will not impute knowledge of the contract coverage standard onto the Arbitrator and, as such, it cannot be said that he manifestly disregarded that principle of law.[4]

Accordingly, the undersigned respectfully recommends that Respondent's motion to vacate regarding the Arbitrator's failure to consider the contract coverage standard be denied.

\* \* \*

In sum, the undersigned respectfully recommends that Respondent's motion to vacate the arbitration award be denied in its entirety.

---

[4] In any event, the contract coverage standard would not have compelled a different outcome at arbitration had the Arbitrator been aware of it.  The contract coverage standard simply requires that the NLRB "honor the parties' agreement, and in each case, it will be governed by the plain terms of the agreement."  *MV Trans. Inc.*, 368 N.L.R.B at 2.  This principle therefore circuitously leads back to a scrutiny of the Arbitrator's interpretation of the CBA.  As discussed *supra*, a reasonable interpretation of the plain meaning of Section 13.01 of the CBA is that it grants Respondent authority to unilaterally control training and safety equipment in the lab, *not* the authority to unilaterally require certain employees to work from home.

### B.   Motion to Confirm the Arbitration Award

When a court denies a motion for vacatur, it must grant the petition to confirm the arbitration award. *See* 9 U.S.C. § 9 ("[U]pon an application for an order to confirm an arbitration award, the court must do so unless the award is vacated, modified, or corrected under [Section] 10 or [Section] 11."); *see also AmeriCredit Fin. Servs.*, 627 F. Supp. 2d at 102 ("Upon the denial of a motion for vacatur, the Court must confirm an arbitration award.") (citations omitted).  As such, the undersigned respectfully recommends that Petitioner's motion to confirm the arbitration award be granted.


## IV.   CONCLUSION

Based on the foregoing reasons, the undersigned respectfully recommends that Petitioner's motion to confirm the arbitration award be granted, and that Respondent's motion to vacate the arbitration award be denied.


## V.   OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report.  28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals.  *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates

as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated:   Central Islip, New York
           September 21, 2021

/s/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge